Sonya C. **SPRAY**, Plaintiff,

v.

**KELLOS–SIMS CRANE RENTAL, INC.**, Defendant.

**Civ. A. No. 179–117.**

United States District Court, S. D. Georgia, Augusta Division.

Feb. 9, 1981.

John H. Ruffin, Jr., Augusta, Ga., for plaintiff.

Wm. A. Trotter, III, Augusta, Ga., David M. George, Tampa, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER

BOWEN, District Judge.

Plaintiff Sonya C. Spray filed her complaint on the 11th day of June, 1979, alleging employment discrimination by the defendant. Plaintiff contends that she was unlawfully terminated from her employment on account of her sex by the defendant corporation in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. She also contends that during her employment, she was paid less for equal work than the male who replaced her. Her second cause of action is alleged under the Equal Pay Act, 29 U.S.C. § 206(d). The Court conducted a bench trial of the case on January 20–21, 1981. This memorandum contains the findings of fact and conclusions of law made in the case by the Court after the trial. The trial was conducted in bifurcated fashion so that the Court could first determine the issue of the defendant's liability, and then proceed to assess damages if appropriate.

This case unfolds an unfortunate drama in American small business. In it, a pleasant, intelligent and eager woman undergoes a sad experience while the wrinkles of a newly acquired business are being ironed out. Plaintiff joins her former boss in a fall from favor as he moves from the relatively commodious environment of a family-owned business to a highly competitive business at the fore of a free enterprise system. The forces which brought about their departure from the construction crane rental business—competition and the profit motive—are at work in every commercial activity in a free economy.

* Speaking figuratively of course, as did the Honorable D. Meade Feild, a former professor of law at Lumpkin Law School, University of Georgia, and former dean of the Walter F.

## FINDINGS OF FACT

Arnold J. Kellos, Jr., generally known as Pete Kellos, purchased from his father the capital corporate stock in Kellos Rental and Sales Company. This company operated a construction equipment rental business in Augusta, Georgia, and Columbia, South Carolina. The Kellos family name has been prominently associated with construction and related businesses in the Augusta, Georgia, area for many years. Plaintiff Sonya Spray first went to work for Kellos in 1972. She was employed by Kellos Rental and Sales Company as a bookkeeper and was paid $185.20 per week.

Sims Crane Service, Inc. [Sims] is a construction crane rental business corporation which is headquartered in Tampa, Florida. In 1976, the Kellos interest in the crane rental business in Augusta and Columbia was sold to Sims. The sale took place by a transfer of cranes, crane accessories, and crane rental goodwill (and perhaps a few accounts receivable) to a new corporation, Kellos-Sims Crane Rental, Inc. [Kellos-Sims]. The Kellos name was retained for obvious business reasons. The new corporation was to acquire the goodwill and business of the company formerly operated by Kellos.

The exact structure of the Sims businesses is unclear. However, it is clear that Sims had a profound effect upon every management decision made by Kellos-Sims. Kellos-Sims had at least ten employees in Augusta, Georgia, and Columbia, South Carolina. Also, Sims Crane Rentals of Georgia, Inc. had an office in Atlanta, Georgia, with two employees. Mr. Dick Phillips, a Sims' employee, was responsible for all of these operations. Sims Crane Service in Tampa has about ten to twelve employees and other employees in Orlando.

Kellos-Sims breathed life * on July 1, 1976, when it acquired assets, employees, and a going business. On that day, Sonya Spray went to work for Kellos-Sims, mak-

George School of Law at Mercer University, when he said "a corporation is an entity created entirely by the law—it is an artificial person with no ass to kick nor soul to be damned."

ing, as before, $185.20 per week. Pete Kellos was a corporate officer and branch manager of the Kellos-Sims Augusta office. Ms. Spray and Mr. Kellos were among the first of the employees of Kellos-Sims. The business was hectic at first. Mr. Kellos ran the business for himself and Sims, assisted from the outset by Ms. Spray. Formerly, she was a bookkeeper. Now, she was a bookkeeper with additional duties. She answered the phone, assisted in the running of the office, and did what was necessary to aid the business. She began to learn about dispatching equipment to the company's customers. To the relief of Ms. Spray and Mr. Kellos, on July 26, 1976, a full-time dispatcher in the person of Mr. J. Lawton Wylds was hired by Kellos-Sims at a salary of $200.00 per week.

A dispatcher has no simple job. While there was no written job description, it is clear that the dispatcher must take telephone calls from company customers, discuss the lift load requirements, consult with operators, assign operators and oilers to certain jobs, schedule the jobs, coordinate the loading and delivery of cranes and accessories, deal with the customer public, and generally make things work. Obviously, this requires tact, coordination skills, and an extensive knowledge of equipment capacity and personnel abilities. Kellos-Sims had a fleet of large and small conventional and hydraulic cranes. For small simple jobs, only one operator would be required, whereas an operator and as many as three oilers would be required to deliver, set up, and manage the larger cranes. The dispatcher is a primary customer-contact person.

Wylds worked as dispatcher for Kellos-Sims (while Ms. Spray worked as bookkeeper) from July 26, 1976 to October 29, 1976, when he left the company because of personal business problems requiring his full-time attention. On September 6, 1976, Wylds received a raise in pay to $250.00 per week. After Wylds left, Ms. Spray and Mr. Kellos handled the dispatcher's duties. Gradually, she assumed all of them. An advertisement seeking applicants for the position of dispatcher was published locally, and some applications were received. By this time, Ms. Spray was feeling comfortable with the duties of dispatcher, and she felt that she was entitled to be considered for the position. She made her availability known to Kellos and Phillips, and the decision to promote her to the position of dispatcher was made. She took the new position at a salary of $200.00 per week (the same amount Wylds started with).

Ms. Spray worked as dispatcher for Kellos-Sims from December 6, 1976, to the date of her termination on April 18, 1977. During her tenure as dispatcher, Ms. Spray satisfied many customers with her service, and received no written reprimand or evaluation of her work. On the other hand, Kellos was not entirely satisfied with Ms. Spray's work. She does admit receiving some "constructive criticism." Kellos received some customer complaints and had to spend more of his time in assisting her in dispatching than he wanted. In turn, Dick Phillips became increasingly dissatisfied with the management of the Kellos-Sims business by Mr. Kellos.

Mr. Kellos and Sims have had litigation of their own and do not appear to be at all collusive. Mr. Kellos is not eloquent in his articulation of the problems that he experienced with Ms. Spray or the defects in her job performance. Little has been said about the dissatisfaction of the Sims interest with Kellos, but it certainly exists. The business was not being run as profitably or in the manner that Sims desired. Ms. Spray's performance was deemed by the Sims interest, acting in the persons of Mr. Kellos and Dick Phillips, to be inadequate by the application of the most subjective standards. Noticeably absent are written job requirements, position application forms, or other documents relating to objective criteria or standards for Ms. Spray's performance. It is clear, however, that Ms. Spray was thought by Kellos-Sims management to be an improper person to continue as dispatcher. Moreover, she was thought to be inadequate for the expansion of duties Phillips envisioned for the person holding the position.

One morning in early April, 1977, Ms. Spray had a talk with Mr. Kellos. He reluctantly and hesitantly told her that he and Mr. Phillips had decided to terminate her employment. He told her that she would be replaced by a male employee who would be more "suitable for the job." Plaintiff attaches great importance to the quoted phraseology used by Mr. Kellos. The Court does not. In the context of the statements made and the other facts in the case, this Court finds that the construction of the statement made by Kellos was that plaintiff would be replaced by an employee more suitable to the position of dispatcher, who, in addition to greater suitability, was also a male. The male employed was not named on the date of Ms. Spray's termination. On the same day, plaintiff met with Mr. Phillips in Mr. Kellos' office and asked if she would be given a letter of recommendation as she had "done nothing wrong." The letter was forthcoming. It adds a poignant factor to this case. The letter was prepared by Mr. Henry Stehmeyer, who was Ms. Spray's supervisor (assumed by the Court to be a comptroller) and her friend. It was given by Mr. Stehmeyer to Mr. Phillips with an earnest request that he sign it. Mr. Phillips did sign the letter, hoping to assist Ms. Spray in seeking other employment. During the trial, Phillips reaffirmed his wish to assist her.

Neither Kellos-Sims nor anyone acting for the Sims interest terminated Ms. Spray on account of her sex. Her termination was the result of their real and imagined fears that she could not properly discharge the duties of a dispatcher. It seems that little consideration was given to continuing Ms. Spray in Kellos-Sims' employ as bookkeeper or otherwise. Also, it seems that management decisions leading to her discharge were casual, almost capricious. Nevertheless, in the intentions and minds of Kellos-Sims' management, the decision was made to terminate Ms. Spray for legitimate, nondiscriminatory purposes, to wit: dissatisfaction with business, reduction of overhead, dissatisfaction with Kellos and dissatisfaction with plaintiff's job performance.

Ms. Spray was followed by a succession of male employees. All were paid a salary greater than hers. Lawton Wylds returned from his business (his problems apparently resolved) and was rehired by Kellos-Sims at $300.00 per week. The rate of pay received by Wylds upon his return represented compensation for duties beyond those of dispatching. At this point, Mr. Wylds also performed management and sales functions, as well as dispatching. Eventually, he was promoted to branch manager of the Augusta office. Kenneth Binns was sent to Augusta by Sims to act as temporary dispatcher upon Wylds' promotion. Binns was paid $300.00 per week because he had additional living expenses after coming to Augusta from Tampa, Florida. Finally, Larry Chubback was hired on a permanent basis at a salary of $250.00 per week.

All in all, Ms. Spray received some shabby treatment in that she was deprived of the commonly accepted courtesy of knowing why she was fired. But this deprivation did not occur because of her sex. It was because the principals of the corporations were, as opposed to their companies, subject to corporeal feelings, fears, and failings.

On May 5, 1977, Ms. Spray filed a timely complaint with the Equal Employment Opportunity Commission [EEOC] and received notice that probable cause existed for believing she was fired because of her sex. Concilliation efforts failed and the EEOC issued Ms. Spray a "Notice of Right to Sue" on March 15, 1979. She filed suit in federal court within 90 days of the receipt of this notice.

## CONCLUSIONS OF LAW

This is not an easy case, but the facts, as found by the Court after the most careful consideration, demand the application of the law enacted by the Congress as interpreted by the appellate courts to partially withhold from the plaintiff the relief which she so earnestly seeks. As noted in the introductory portion of this memorandum, plaintiff couches her cause of action in two federal statutes. These will be dealt with separately.

Although originally brought as a class action, the case was never certified as one. The case proceeds as a dispute between the named parties.

## I. TITLE VII

Plaintiff contends that her termination was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* This Title prohibits discrimination based upon sex and race by employers in their hiring, firing, terms and conditions of employment. "Employer" is defined by § 2000e(b) as a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. Because of the confusion of the Sims' business interest in this case, and the failure of the defendant to demonstrate by a preponderance of the evidence that it has less than 15 employees, this Court concludes that the defendant Kellos-Sims is the alter ego of other Sims' interest in Georgia and Florida, and, consequently, is an "employer" as defined by 42 U.S.C. § 2000e(b). *See Houston Oil Field Material Co., Inc. v. Stuard,* 406 F.2d 1052 (5th Cir. 1969).

In a Title VII suit, the plaintiff carries the burden of establishing a prima facie case of employment discrimination. *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973). The elements of a prima facie case in an action alleging unlawful termination are: (1) membership in a protected minority; (2) qualification for the job; (3) discharge and (4) replacement by a member of a non-minority. *Marks v. Prattco,* 607 F.2d 1153 (5th Cir. 1979). Evidence adduced at trial clearly establishes these elements. Plaintiff is protected under Title VII from sex discrimination; her letter of recommendation and testimony presented by defendant indicate that she was qualified as a dispatcher; she was fired and replaced by a male. When such a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. *Adams v. Reed,* 567 F.2d 1283 (5th Cir. 1978).

The Court has admitted the EEOC investigative report and findings into evidence to aid in its determinations. Civil litigation at a district court level is a trial de novo, however, and an EEOC report is not binding. Accordingly, it has been given no more weight than any other testimony received at trial. *Garcia v. Gloor,* 618 F.2d 264 (5th Cir. 1980); *Smith v. Universal Services, Inc.,* 454 F.2d 154 (5th Cir. 1972). The total evidence before the Court presents several possible explanations relating to the firing interview of which Mr. Kellos and Ms. Spray have such different recollections. It appears with clarity that Ms. Spray was not given the reasons for her termination. This could be the result of (a) the absence of reasons or (b) the absence of the determination and fortitude which would be obviously required in considerable amount to explain the firing of an employee with whom a relatively close and friendly business relationship had existed for some years. Either way, it was an unfortunate method of handling the conference. Indeed, it may even have been the cause for this lawsuit.

A plausible explanation for plaintiff's firing is that the branch manager of Kellos-Sims could have blamed many, if not all, of the company's operating problems on the dispatcher. As Kellos was the primary contact with Sims' representative Dick Phillips, the Sims interest could very legitimately have developed an opinion that the dispatcher, Ms. Spray, was inefficient. If Ms. Spray's termination was due to misinformation given to Sims by Kellos, her firing would not be grounds for a Title VII action. If, however, Kellos, in an unwitting attempt to appear blameless, told Ms. Spray that Sims was firing her because she was a woman, then this Court could reach a different conclusion. Clearly, Kellos was Sims' agent in Augusta for managerial and operational purposes. His acts or omissions within the scope of his employment would be attributable to his principal Sims. The Court has made no such finding of fact regarding Ms. Spray's termination, how-

ever. She was terminated from her employment because she was not as efficient as another available dispatcher, and because company personnel legitimately felt that she could not expand her duties to become an assistant or branch manager.

Accordingly, the Court concludes that plaintiff's termination was due to legitimate, nondiscriminatory reasons which are not pretextual.

## II. EQUAL PAY ACT OF 1963

Section 2000e–2(h) is the equal pay provision of Title VII. It permits an "employer to differentiate upon the basis of sex in determining the amount of wages or compensation paid or to be paid to employees ... if such differentiation is authorized by the provisions" of section 206(d) of Title 29 [the Equal Pay Act]. The Equal Pay Act provides in part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, that an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

■ Plaintiff's burden in an action alleging unequal pay is to prove that a wage differential is based on sex and that there was performance of equal work for unequal compensation. Plaintiff need not show that the jobs were identical, but that they were substantially equal. *Orr v. Frank R. MacNeill & Son*, 511 F.2d 166 (5th Cir. 1975).

■ In this case, plaintiff assumed duties and responsibilities beyond those of bookkeeping. Eventually, these duties included all the functions of the dispatcher. Her predecessor, Mr. Wylds, performed essentially equivalent, if not identical, functions and was paid $50.00 more per week than was plaintiff. All Kellos-Sims dispatchers received higher salaries than did plaintiff. Kellos-Sims had only one dispatcher at all relevant times, so the only basis of comparison is between Ms. Spray's job and that held by her predecessor, Mr. Wylds. Since the Court finds that both performed substantially the same duties but received unequal pay, plaintiff has established a prima facie case of wage discrimination. *Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563 (5th Cir. 1979).

■ There are four defenses included within the Equal Pay Act, but only one is applicable here: that the unequal pay was not based on sex. Defendant has not successfully shown that the pay differential was based on a factor other than sex. Plaintiff's prima facie case has not been rebutted.

■ At first, it may appear inconsistent that plaintiff can recover under the Equal Pay Act claim and not under the Title VII claim. While the discrimination envisioned by both of these statutes is ordinarily to be considered harmoniously, the different results under each are attributable solely to the evidence. The plaintiff has made out a prima facie case under both causes of action. On the Title VII claim, however, the defendant has articulated a legitimate nondiscriminatory purpose which is not pretextual for plaintiff's determination. On the other hand, the defendant has not rebutted the plaintiff's prima facie Equal Pay Act claim by evidence sufficient to satisfy the Court of the defendant's nondiscriminatory intentions. Where the plaintiff has made out a prima facie case and shifted the burden of proof to the extent that her case has been established by a preponderance of the

evidence, unless it is rebutted to the extent that the Court is at least equally disposed toward the contentions of the plaintiff and defendant, the plaintiff must prevail. Thus, while paradoxical, the different results of the two causes of action are not inconsistent.

As noted earlier in this opinion, the trial was conducted in bifurcated fashion. The intent of that bifurcation was to first resolve the question of liability and subsequently to resolve the issue of damages, if any. Here, there is no need for further evidence. Very simply, the plaintiff was paid $200.00 per week when her salary should have been $250.00 per week. Under any calculation, the employer should be permitted to deduct from the total award appropriate amounts required under state and federal law to be deducted from an employee's wages. The judgment of the Court shall be framed accordingly.

